**FILED**

**MARCH 10, 2010**
KAREN S. MITCHELL
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

———————————————————

| | | |
|---|---|---|
| STEPHEN C. WALKER, PRO SE, | § | |
| also known as | § | |
| STEPHEN CLAYTON WALKER, | § | |
| TDCJ-CID No. 1417300, | § | |
| Previous TDCJ-CID No. 701711, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2:08-CV-0084 |
| | § | |
| JOE S. NUNN ET AL., | § | |
| | § | |
| Defendants. | § | |

### REPORT AND RECOMMENDATION TO GRANT
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On this day came for consideration defendants' March 3, 2009 motion for summary judgment filed in the above-referenced and numbered cause. Plaintiff filed his response March 31, 2009, and an evidentiary hearing was conducted on October 8, 2009.

Plaintiff, proceeding pro se, filed the instant cause while a prisoner confined in the Texas Department of Criminal Justice, Correctional Institutions Division, pursuant to Title 42, United States Code, section 1983, complaining against defendants JOE S. NUNN, NATHANIEL QUARTERMAN, BRUCE ZELLERS, GLEN H. WHITFIELD, FLOYD BAXTER, and NORVEL ARNOLD. On December 29, 2008,. plaintiff filed an Amended Complaint adding defendants SHAWN WATSON, KENNETH BURKETTE, and JOYCE VANDERBURG. Defendant BAXTER was dismissed on January 26, 2009 and defendant JOYCE VANDERBURG was dismissed February 26, 2009. RICK THALER was substituted for NATHANIEL QUARTERMAN, on September 26, 2009.

Plaintiff's motion to certify class was denied on February 25, 2009, and the instant cause is an individual suit on plaintiff's own behalf.

## STATEMENT OF THE CASE

Plaintiff claims that, since his May 2, 2007 assignment to the Jordan Unit, he has been subjected to cruel and unusual punishment in violation of the Eighth Amendment by being subjected to a schedule and to conditions of staff misconduct knowingly maintained by defendants in order to deprive[1] or which have the effect of depriving him of the minimum amount of sleep necessary for reasonable maintenance of health.

Plaintiff requests injunctive relief in the form of an order that prisoners be provided the opportunity to receive at least seven hours of uninterrupted sleep; nominal, punitive, and compensatory damages, costs.  Plaintiff also requests that defendant THALER and the Texas Department of Criminal Justice be ordered to "create and adopt a policy that ensures prisoners receive adequate sleep as recognized by the medical community and current standards of decency."

## UNDISPUTED FACTS

Plaintiff was a prisoner confined in the Clements Unit of the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID) at all times relevant to this lawsuit.  At all times relevant to this cause, defendants were employed with the Texas Department of Criminal Justice.  At all times relevant to this cause, defendant QUARTERMAN/THALER[2] was the Director of TDCJ-CID, defendant ZELLERS was a Regional Director, defendant NUNN was the Warden of the Jordan Unit, and Defendant WHITFIELD was Assistant Warden at the Jordan Unit.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

By their motion, defendants argue plaintiff has not shown he suffered a physical injury, and any evidence of injury based on the February 2, 2008 incident when plaintiff injured his head while working on the job is inadmissible because plaintiff failed to exhaust administrative

---

[1]Page 53, paragraph 133 of plaintiff's amended complaint.

[2]Defendant THALER was substituted for defendant QUARTERMAN on September 26, 2009.

2

remedies on that incident before filing suit.  Defendants further contend plaintiff has failed to establish their personal involvement on his claim of deliberate indifference.  Defendants assert plaintiff has not overcome their entitlement to qualified immunity as to plaintiff's claims against them in their individual capacities, and argue they have established their entitlement to Eleventh Amendment Immunity as to any of plaintiff's claims against them in their official capacities.

## THE STANDARD OF SUMMARY JUDGMENT REVIEW

Summary judgment may be granted where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Federal Rule of Civil Procedure 56(c).  Consequently, after adequate time for discovery and upon motion, summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party bears the burden of proof.  *Celotex v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Because the consequences of summary judgment are so severe, the court must be careful to avoid premature termination of legitimate lawsuits merely because of unskilled presentations. *Murrell v. Bennett*, 615 F.2d 306 (5th Cir. 1980).  In determining a movant's request for summary judgment, all reasonable inferences must be made in favor of the party opposing the motion.  *Phillip's Oil Co. v. OKC Corp.*, 812 F.2d 265, 272 (5th Cir.), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987).  Only disputes of facts that could affect the outcome of the suit at trial will properly preclude the entry of summary judgment.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A complete failure of proof concerning an essential element of the nonmoving party's case is fatal and entitles the moving party to judgment as a matter of law.  *Celotex v. Catrett*, 477 U.S. at 322-23, 106 S.Ct. at 2552.  The moving party bears the initial burden of demonstrating

3

the absence of a genuine issue of material fact.  Where the movant does not bear the burden of proof at trial, it may meet its summary judgment obligation by pointing out the absence of evidence to support the non-movant's claims.  *See, Celotex v. Catrett*, 477 U.S. 317 at 325. Once the movant has met its obligation, the burden shifts to the non-movant to adduce evidence showing a genuine issue of material fact for trial.  *Id*. at 324.  This burden may be satisfied by designating specific facts on the record and articulating the precise manner in which they support the non-movant's claims.  *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).  The nonmovant must delineate specific facts which demonstrate the presence of a genuine issue of material fact. *Id.*; *Judwin Properties, Inc. v. U.S. Fire Ins. Co.*, 973 F.2d 432, 435 (5th Cir. 1992).  A motion for judgment as a matter of law is properly granted when the facts and inferences point so strongly in favor of the movant that a rational jury could not arrive at a contrary verdict.  If there is substantial evidence, that is, evidence of such quality and weight that reasonable and fair-minded jurors might reach a different conclusion, then the motion for judgment as a matter of law should be denied.  *Waymire v. Harris County, Texas*, 86 F.3d 424, 427 (5th Cir. 1996).

### THE STANDARD OF SUMMARY JUDGMENT REVIEW
### UPON A PLEA OF QUALIFIED IMMUNITY

Since qualified immunity depends on whether the defendant violated a clearly established constitutional right, a preliminary inquiry must be made whether the plaintiff has asserted a violation of any constitutional right at all.  *Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991).  Analysis at this stage is performed under the "currently applicable constitutional standards."  *Rankin v. Klevenhagen*, 5 F.3d 103, 106 (5th Cir. 1993).

The second prong of the qualified immunity test is whether the constitutional right alleged to have been violated was clearly established at the time of the incident; and, if so, whether the conduct of the defendant was objectively unreasonable in  light of contemporaneous clearly-established law.  *Hare v. City of Corinth*, 135 F.3d 320, 328 (1998).  Although analysis under the first prong requires the court to consider currently applicable constitutional standards,

analysis under the second prong requires a court to measure the objective reasonableness of an official's conduct with reference to the law as it existed at the time of the conduct in question. *Id.* (citing *Rankin v. Klevenhagen*, 5 F.3d 103, 108 (5th Cir. 1993).

In deciding which of the two prongs to address first, the court may utilize its sound discretion in light of the circumstances in the particular case at hand. *Pearson v. Callahan*, ___ U.S. ____, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

## EVIDENTIARY HEARING

At the hearing, plaintiff declared that he had all the discovery he needed and was ready to reply to defendants' motion for summary judgment.

Plaintiff called Doctor Ignatius Rozario as a witness.  After being duly sworn, Dr. Rozario testified he was a psychologist and had seen plaintiff on February 12, 2008 for plaintiff's complaints of insufficient sleep due to the prison schedule.  Doctor Rozario stated he did not remember agreeing with plaintiff that the amount of sleep available to plaintiff was inadequate but testified that having only two hours of sleep per night would not seem to be adequate and could cause "psychological issues."  Doctor Rozario also stated he had spoken with others complaining of inadequate sleep as well.

On cross examination, Dr. Rozario testified he had a Master's degree in Counseling and worked primarily at the Neal Unit, with visits to the Jordan Unit on alternate Tuesdays.  He stated he had seen plaintiff only once and that, on that occasion, plaintiff appeared alert, oriented, and lucid.  He said he did not observe any signs of sleeplessness.  Doctor Rozario stated he had no independent knowledge of the sleep conditions or scheduling in the prison and did not remember telling plaintiff prison conditions were harmful or that the noise or scheduling at the Jordan Unit were an ongoing problem.  He stated he had not come to any conclusion concerning plaintiff's condition and made no diagnosis.  Doctor Rozario also stated plaintiff had told him he had refused medication for his sleeplessness.

When asked if he had any other evidence to introduce, plaintiff stated one of the main issues was the noise levels at the Jordan Unit during the day.  Plaintiff said defendants have presented an ACA noise level reading for the Jordan Unit and stated that his own Affidavit presented to the Court contained a statement made to him by Shawn Watson showing the reading was taken only once and in controlled conditions.  Plaintiff also submitted three Affidavits into evidence.  One was from a Jonathan Downey, a door mechanic, stating that the doors are slammed so hard it breaks the striker plates.  Plaintiff stated this happens twice an hour from 7:00 a.m. until 10:30 p.m.  He said that after 10:30 p.m., the scheduling of laundry and morning workers created a problem with getting uninterrupted sleep.  Plaintiff also introduced several I-60's to Shawn Watson, Safety Officer at the Jordan Unit, which were admitted into evidence solely for the purpose of showing they were sent, but not for the truth of the matter asserted.

Warden NUNN, the Senior Warden at the Johnston Unit, was called by defendants, sworn, and stated he had previously been Senior Warden at the Jordan Unit for over two years. He oversaw the daily operations of the Jordan Unit and testified the Jordan Unit housed approximately 1,000 inmates and included a boot factory.  He said that they started feeding breakfast between 3:00 and 3:30 a.m.  Industry work, field force work, and education classes all began around 5:00 or 6:00 a.m.  Lunch began around 10:30 a.m., and was followed by afternoon classes and work.  Warden NUNN testified dinner began around 3:30 p.m.; followed by recreation and dayroom or other free time.  He said the dayrooms are open from 7:00 a.m. until 10:00 p.m. and an inmate who is not working can watch T.V., play handgames, or stay in his cell and sleep or do whatever he wants.  Each inmate is assigned a job if he is not on medical restriction and he must work, attend school if required by his treatment plan, and keep his cell clean. Warden NUNN testified there are eight counts in each 24-hour period.  Seven are headcounts and one is a bed-book count.  A headcount requires only that the guard count the number of persons present and needs no active participation from the inmates.  The bed-book count is conducted after the last rack-up at 10:00 p.m. to avoid disturbing inmate sleep

6

unnecessarily and requires that the inmate present his I.D. to allow verification of identity and that the inmate is in the correct place. Warden NUNN testified there was no policy or activity carried out by prison officials that prevented inmates from sleeping in their free time. He stated the unit had to run on a 24-hour per day schedule because 3,000 meals had to be prepared each day for the 1,000 inmates, the laundry had to clean the inmates' clothes, the school had to be conducted, and the shoe factory had to be run. He testified there was going to be some noise around the clock and there was no way to eliminate all the noise if the prison was to keep functioning. He said inmates were allowed the privilege of having radios and fans. Warden NUNN further testified the intercoms had to be used to make call-outs for various things throughout the day, such as telling various inmates it is time for work or school.

Warden NUNN recalled being told by SHAWN WATSON, at Risk Management, of plaintiff's complaints concerning noise and sleep deprivation, and said he instructed WATSON to investigate to be sure the decibel levels were in compliance. Warden NUNN testified inmates in the shoe factory work from 6:00 a.m. to 11:30 a.m. and then go to chow and are through. He stated he didn't recall any other complaint from any other inmate regarding noise.

Warden NUNN testified an "exceptions report" is automatically generated when there is a large number of grievances on a single issue and stated no exceptions report was ever generated on the issue of noise. He further stated there was no way to silence the prison for 7.5 to 8 hours at a time and that he had no way to implement such a policy.

On cross-examination, Warden NUNN testified ingress-egress was performed each hour to allow inmates in and out of their cells, so the cell doors which needed to be opened to allow the inmates wanting in or out of their cells were opened and shut. He explained that an ingress involved an officer walking into the dayroom and finding out if any inmates in the dayroom wanted to go into their cells. If they do, they go stand in front of their door and the officer lets them in and the inmate can get whatever he wants from his cell or do whatever he wants. Inmates are told an egress will be conducted in 5 or 10 minutes and, at the appropriate time, the

7

guard returns and lets each inmate out of his cell so he can go into the dayroom.  Warden NUNN

testified all the doors were not opened because there was no need to open a cell door if no one

was going in or out and that a practice of opening all the doors would be unsafe.  He further

stated final rack-up was at 10:30 p.m. on week nights and bed-book count took about 30 minutes.

Warden NUNN testified the result of SHAWN WATSON's investigation was that the

prison was in compliance with light and noise levels set by the ACA and that there was no

evidence to his knowledge that policies and procedures were not followed at the Jordan Unit.  He

stated earplugs were available for purchase by inmates for the same reason fans were; some

inmates preferred them.

Warden NUNN further testified all building schedules were usually reevaluated twice a

year and it was mandatory they be reevaluated at least once a year.  He stated that, when such an

evaluation took place, they examined everything from pill window times, to education, to work,

taking into account the functioning of the unit and the ability to provide for the offenders those

things the courts require be provided such as laundry, food, etc.  He also testified the Jordan Unit

schedule was similar to that of other similarly-situated units.

Kathy Jones was sworn and testified she was the Standards Coordinator in the Region V

Director's Office and that she was handling noise monitoring of Texas prisons for ACA

accreditation.  She said she had worked at TDC for three and one half years and had received

training in noise monitoring by the Environmental Branch.

She stated she performed noise monitoring at the housing section of the Jordan Unit for

ACA Quality of Life accreditation and said that, while TDCJ does not have an independent noise

standard, levels at the Jordan Unit were in compliance with ACA standards.

Ms. Jones testified a daytime reading did not involve turning off fans or the television,

but inmates were asked to be quiet.  She stated night time readings were taken between

10:00 p.m. and 1:00 a.m. and fans and radios were turned off for that reading so that it reflected

the noise level "minus all the noise they can control."

8

At the end of the hearing, plaintiff argued defendants could construct a schedule allowing 7.5 hours of uninterrupted sleep and contended the control of noise rests with prison authorities, stating they should adhere to prison policy and control T.V. noise levels and the opening and closing of cell doors.  Further he argued, the roster count could be conducted at 9:00 p.m. instead of 11:00p.m. and laundry and breakfast times could be moved.

Defendants countered that plaintiff's request was unreasonable and that after mandatory activities a large amount of time is left for inmates to sleep.

## THE LAW AND ANALYSIS

Sleep is one of life's basic necessities and conditions designed to prevent sleep might violate the Eighth Amendment.  *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999).

Plaintiff's claim is that he is kept awake by the sounds made by television and by other inmates, sounds made by guards on the intercom, and the opening and closing of cell doors.  He further claims the schedule at the prison is intentionally structured to keep inmates sleep-deprived and, therefore, more compliant, or that officials are aware that the schedule keeps inmates sleep-deprived.  Plaintiff stated he sleeps only about two hours a night.

Section 1983 does not create supervisory or *respondeat superior* liability.  A supervisory official may be held liable only when he is either personally involved in the acts causing the deprivation of a person's constitutional rights, or there is a sufficient causal connection between the official's act and the constitutional violation sought to be redressed.  *Thompkins v. Belt*, 828 F.2d 298, 304 (5th  Cir.1987); *Douthit v. Jones*, 641 F.2d 345,  346 (5th Cir.1981) (*per curiam*).  Plaintiff has not alleged any of the defendants personally allowed other inmates to violate existing rules regarding excessive inmate noise, such as that forbidding slapping dominoes on the table, etc.  To the extent he feels one or more defendant is responsible based on his supervisory position, the acts of subordinates do not trigger any individual section 1983 liability for supervisory officers.  *Champagne v. Jefferson Parish Sheriff's Office*, 188 F.3d 312, 314 (5th Cir. 1999).

In his summary judgment response, plaintiff attached, at page 27 of his exhibits, a document showing his typical schedule.  The document shows that plaintiff's day begins when he is awakened about 2:00 or 2:15 a.m. to get ready for breakfast.  He then attends breakfast, laundry, work, lunch, a shower, and dinner.  Plaintiff returns from dinner between 4:30 to 5:20 p.m.  While plaintiff typically chooses to spend until 7:45 p.m. in the unit law library, he is not required to do so, and could spend the time from 5:20 p.m. until 2:00 a.m. any way he chooses, including sleeping.  Although plaintiff notes several counts occur throughout the day, the un-refuted evidence from Warden NUNN's testimony is that only the 11:00-11:40 p.m. "roster count," called a "bed-book count", requires an inmate's active participation by standing at his door with his I.D. card to allow verification of his identification and that he is in the proper location.  All the other counts merely require the inmate to be counted by a guard and do not require the inmate's active participation.

There has been no judicial determination that inmates are entitled to 7.5 hours of sleep per night.  Nevertheless, the period from 5:20 p.m. to 2:00 a.m. allows sufficient time for 8.5 hours of sleep.  Even if the 30-40 minutes consumed by the bed-book count is subtracted, it leaves 7 hours and 50 minutes, which shows plaintiff has available to him at least 7.5 hours per night in which to sleep.

Plaintiff, however, wants uninterrupted sleep and complains officers perform a roster count, and make noise opening and closing cell doors and calling out inmates on the intercom. In *Craft v. Johnson*, 69 Fed. Appx. 657 (5th Cir. 2003), the Fifth Circuit examined inmate complaints about count and bed checks interrupting sleep and concluded the practice did not expose inmates to a risk that was so grave that it violated contemporary standards of decency. *Id*.  The Court notes prison officials have a legitimate penological interest in maintaining security by verifying the identity of each inmate and ensuring he is actually still incarcerated and is in the proper cell before locking inmates in their cells for several hours.  Such a policy protects both staff and inmates alike, and is a core function of any prison.

10

Inmate complaints about sleep interference because of doors being opened and closed and associated prison policies was examined by the Fifth Circuit in *Atkinson v. Johnson*, 74 F3d. Appx. 365 (5th Cir. 2003), affirming dismissal on summary judgment.

By his testimony, Warden NUNN stated the Jordan Unit housed about 1,000 inmates and was like a small city which runs 24 hours a day, every day, with 3000 meals prepared, clean laundry provided, education programs conducted, and work in the shoe factory and fields performed.  Further, inmates must be provided with recreational opportunities either in the dayroom and/or recreation yard.

What is clear is that plaintiff is in an environment which must accommodate not only him but about 999 other inmates as well.  Whatever time plaintiff eats breakfast, someone else will have to be called to get up before plaintiff in order to cook breakfast and, whatever time plaintiff receives clean laundry, someone else will have to be called first to go to the laundry to get the clean clothing and transport it to the distribution site.  Thus, even if plaintiff's needs were the only needs to be considered, and they are not, plaintiff's schedule is not and cannot be the only schedule to be considered in running and maintaining the prison.

While plaintiff faults defendant administrators and supervisors for the noise necessitated by the schedule, he has introduced evidence showing ear plugs are available and that he was offered medication to help him sleep despite the noise.  He has elected not to utilize the earplugs and has refused the medication.  Plaintiff has argued he should not need such aids to get a good night's sleep.  Plaintiff, however, is in prison, and a prison (small city) must operate around him in close proximity while he sleeps.

It is prison administrators, and not the courts, who are charged with making the difficult judgments concerning institutional operations.  *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977).   Institutional life, whether in a prison, a hospital, or even a college dormitory generally is not as comfortable as when one is free to live in one's own home.  As former Chief Justice Rehnquist, writing as a Justice, remarked,

11

"[i]n short, nobody promised [inmates] a rose garden; and I know of nothing in the Eighth Amendment which requires that they be housed in a manner most pleasing to them, or considered even by most knowledgeable penal authorities to be likely to avoid confrontations, psychological depression, and the like." *Atiyeh v. Capps*, 449 U.S. 1312, 1315-16, 101 S.Ct. 829, 831, 66 L.Ed.2d 785 (1981). Inmates may only expect that the society they once abused will provide them with constitutionally adequate confinement, not "the amenities, conveniences and services of a good hotel." *Harris v. Fleming*, 839 F.2d 1232, 1235-36 (7th Cir. 1988)(quoted with approval in *Wilson v. Lynaugh*, 878 F.2d 846, 849 n.5 (5th Cir. 1989).

A prisoner asserting a claim that conditions of confinement constitute cruel and unusual punishment must show deliberate indifference on the part of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The appropriate definition of "deliberate indifference" under the Eighth Amendment is "subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 1980, 128 L.Ed.2d 811 (1994); *Reeves v. Collins*, 27 F.3d. 174 (5th Cir. 1994). In this regard the Supreme Court has cautioned:

> [A] prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 511 U.S. at 837-38, 114 S.Ct. at 1979. It is only under exceptional circumstances that a prison official's knowledge of a substantial risk of harm may be inferred by the obviousness of the substantial risk.

Although plaintiff argues he placed defendants on notice of conditions presenting a substantial risk of serious harm by his grievances and complaints, his grievances and complaints were only complaints. Those grievances did not establish that the conditions of which he complained were unconstitutional or harmful and did not place defendants on notice of that fact. The un-rebutted summary judgment testimony by Warden NUNN shows that no "exceptions

12

report" was ever generated showing an usually high number of inmate complaints regarding noise. Further, Warden NUNN's un-rebutted testimony shows that when plaintiff's complaints were brought to his attention, he instructed defendant WATSON to investigate and that WATSON's investigation showed the Jordan Unit to be within approved ACA Quality of Life limits. See, also, Appendix C to defendants' motion for summary judgment.

The defendants did not have to accept plaintiff's opinion of his conditions of confinement and were entitled to rely on the results of the investigation and the fact that the overall conditions of the prison have not before been found to be cruel and unusual.

Plaintiff has failed to meet his burden of showing he was subjected to conditions which constituted an excessive risk to his health or safety. Further, defendants have shown that their conduct was objectively reasonable with reference to the law as it existed at the time of the conduct in question, and they are entitled to qualified immunity. *Hare v. City of Corinth*, 135 F.3d 320, 328 (1998); (citing *Rankin v. Klevenhagen*, 5 F.3d 103, 108 (5th Cir. 1993).

As an alternative to his theory that prison officials simply knew the effect of the schedule was to deprive him of sleep, plaintiff has plead that prison officials created and enforced the schedule for the purpose of depriving him and other inmates of sleep. By his summary judgment response, plaintiff refers the Court to his "verified amended complaint." Further, in his amended complaint, plaintiff has included statements he says were made by various TDCJ staff members to the effect that inmates were sleep deprived and what was being done to him was wrong. In paragraph 55, at page 14, of his amended complaint, plaintiff states a Willard Kiper said it was done to keep energy levels low.

The Court notes plaintiff's amended complaint is not a verified complaint; it contains no jurat and is not submitted under penalty of perjury. Further, even if the amended complaint had been submitted under penalty of perjury and was, therefore, admissible evidence, that would not bootstrap any hearsay evidence in it into competent summary judgment evidence. *See, e.g., Cormier v. Pennzoil Exploration & Production Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (citing

13

*Martin v. John W. Stone Oil Distributor, Inc.,* 819 F.2d 547, 549 (5th Cir.1987)(neither the district court nor the court of appeals may properly consider hearsay evidence in affidavits and depositions)). Thus, plaintiff has provided no competent summary judgment proof to establish an issue of material fact concerning this claim.

Plaintiff has included Kenneth BURKETTE, the Assistant Manager at the Jordan Unit Shoe Factory, as a defendant. Plaintiff does not allege, and there is no evidence indicating, defendant BURKETTE had anything to do with setting the schedule or with the establishment or enforcement of prison policy on noise conditions in plaintiff's housing area. In fact, plaintiff has stated BURKETTE was sympathetic to his complaints of sleep deprivation and allowed plaintiff to take time off to sleep when he could. Plaintiff has failed to state a claim against defendant BURKETTE.

Plaintiff has sued defendant VANDERBURG for writing him a disciplinary case when he fell asleep while at work in the Boot Factory and hit his head. Plaintiff claims this constituted cruel and unusual punishment. As with defendant BURKETTE, plaintiff does not allege, and there is no evidence indicating, defendant VANDERBURG had anything to do with setting the schedule or enforcing prison policy on noise conditions in plaintiff's housing area. Defendants argue plaintiff did not exhaust administrative remedies before filing suit and present documents at Appendix B to their Motion for Summary Judgment. Plaintiff originally filed the instant suit in the United States District Court for the Southern District of Texas, Houston Division, on March 3, 2008 and exhausted administrative remedies on or about April 15, 2008 (Defendants' Summary Judgment Appendix B at pages 14-15). Therefore, any claims plaintiff may wish to assert based on this incident are barred by Title 42, section 1997e(a).

As to defendants' assertion of Eleventh Amendment immunity, by his response, plaintiff stipulates he is not requesting monetary relief against defendants in their official capacities.

**CONCLUSION**

For the reasons set forth above, it is clear that, drawing all reasonable inferences in favor of plaintiff, defendants have shown there is no material issue of disputed fact which precludes entry of summary judgment in the instant cause and they are entitled to judgment as a matter of law both on the merits and based on their defense of qualified immunity.

It is the opinion of the Magistrate Judge and RECOMMENDATION to the United States District Judge that defendants' motion for summary judgment be GRANTED and that STEPHEN C. WALKER's claims against defendants DISMISSED WITH PREJUDICE.  Federal Rule of Civil Procedure 56(c).

The United States District Clerk shall mail a copy of this Report and Recommendation to plaintiff and to each attorney of record by first class mail.

IT IS SO RECOMMENDED.

ENTERED THIS 10TH DAY OF MARCH, 2010.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

**\* <u>NOTICE OF RIGHT TO OBJECT</u> \***

Any party may object to these proposed findings, conclusions and recommendation.  In the event parties wish to object, they are hereby NOTIFIED that the deadline for filing objections is fourteen (14) days from the date of filing as indicated by the "entered" date directly above the signature line.  Service is complete upon mailing, Fed. R. Civ. P. 5(b)(2)(C), or transmission by electronic means, Fed. R. Civ. P. 5(b)(2)(E).  **Any objections must be filed on or before the fourteenth (14th) day after this recommendation is filed** as indicated by the "entered" date.  *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(d).

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation."  Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties.  A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district

15

court.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).

16